UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------X
UNITED STATES OF AMERICA,

              v.                                    24-CR-51 (AMD)

MARKEL WASHINGTON,

        Defendant.
---------------------------------------------------X

**SENTENCING MEMORANDUM
ON BEHALF OF MARKEL WASHINGTON**

Elena Fast, Esq.
The Fast Law Firm, P.C.
521 Fifth Avenue, 17 Floor
New York, New York 10175
Phone: (212) 729-9494
Email: elena@fastlawpc.com
*Counsel for Markel Washington*

I. **PRELIMINARY STATEMENT**

Mr. Markel Washington (hereinafter "Mr. Washington") requests that this Court consider all the factors contained herein and decide on a sentence that is sufficient, but not greater than necessary, to accomplish the stated objectives found in 18 U.S.C. § 3553(a). The Defense respectfully submits that a sentence of one year and one day of incarceration, followed by two years of supervised release, is sufficient, but no greater than necessary to achieve the statutory goals of sentencing.

II. **PROCEDURAL HISTORY**

On February 1, 2024 an Indictment was filed in the Eastern District of New York charging Mr. Washington and his co-defendants with Conspiracy to Commit Bank Fraud and Wire Fraud in violation of 18 U.S.C. § 1349, Bank Fraud in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2 and Aggravated Identity Theft in violation of 18 U.S.C. §§ 1028A(a)(1) and (b), and §1028A(c)(5) and §2.

On February 7, 2024, Mr. Washington was arrested by agents from the United States Postal Inspection Service (hereinafter "USPIS"). PSR ¶ 12. On August 13, 2024, Mr. Washington appeared before Your Honor and pleaded guilty pursuant to a written plea agreement to Count Two of the Indictment, Bank Fraud in violation of 18 U.S.C. §1344 and 18. U.S.C. §2. PSR ¶ 1. Count Two charges Mr. Washington and his co-defendants with executing, and attempting to execute, a scheme and artifice to defraud Bank-1, the deposits of which are insured by the Federal Deposit Insurance Corporation (hereinafter "FDIC"), and to obtain moneys, funds, credits and other property owned by and under the custody and control of, Bank-1 by

means of materially false and fraudulent pretenses, representations and premises in June of 2023. *Id*. Mr. Washington is scheduled to appear for sentencing on December 3, 2024.

### III. LEGAL STANDARDS

Under 18 U.S.C. § 3553(a), sentences shall be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, rehabilitation, specific and general deterrence. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007)

Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented and in light of each of the factors set forth in § 3553(a). *See United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."). While the Court must calculate the applicable Sentencing Guidelines range, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

A sentencing court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

2

sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81 (1996)). To conduct an individualized assessment, the Sentencing Reform Act provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. This right is fundamental to our sentencing process and has been recently affirmed by the United States Supreme Court. *See Concepcion v. United States*, 142 S.Ct. 2389, 2398-99 (2022) (quoting *Dean v. United States*, 581 U.S. 62, 66 (2017)) ("There is a long and durable tradition that sentencing judges enjo[y] discretion in the sort of information they may consider at an initial sentencing proceeding") (internal quotation marks omitted).

Consistent with this principle, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors. *See* 18 U.S.C. § 3553(a)(1)-(7). Against the backdrop of these factors, Mr. Washington respectfully submits that a variance is warranted in his case.

## IV. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Washington was part of a fraudulent scheme to deposit a U.S. Treasury check in the amount of $125,386.81 (hereinafter the "Check"), made out to "Victim-1", a CJA lawyer. PSR ¶ 6. The Check was compensation for attorney services for the representation of an indigent defendant pursuant to the Criminal Justice Act in a federal criminal prosecution. PSR ¶ 5-6. Investigation revealed that one of Mr. Washington's co-defendants stole Victim-1's identity and "creat[ed] fraudulent identification documents containing [Victim-1's] personal identifiers along

with [another co-Defendant's] photograph." PSR ¶ 8. Mr. Washington's other co-defendant opened an account in Victim-1's name using a fraudulent driver's license and attempted to deposit the check without Victim-1's authorization. PSR ¶ 10. Mr. Washington accessed said bank account online to check on the status of the check deposit. *Id*. Mr. Washington's phone was used to place multiple calls to the bank to check on the status of the deposit. *Id*. Additionally, Mr. Washington possessed "four photographs of [co-defendant] that were included on the fraudulent New Jersey driver's license containing [Victim-1's] name and birthdate that were submitted to Bank-1" on his iCloud. *Id*.

The Department of Treasury "was able to cancel the stolen check originally issued to [Victim-1], upon learning of the fraudulent scheme, and issued [Victim-1] a replacement check." PSR ¶ 75. Nevertheless, it took approximately six months for Victim-1 to receive a replacement check. PSR ¶ 16. Additionally, Victim-1 spent a large amount of time with credit agencies, the banks, social security administration, the Office of Defender Services, completing multiple fraud alerts for protection, and responding to unauthorized uses of her social security number; time that would have otherwise been dedicated to working on her CJA cases. *Id*.

Mr. Washington is incredibly remorseful for his conduct. As he states in his letter, he is "profoundly sorry for [his] actions and for the hard and inconvenience he caused [Victim-1]. [He] had absolutely no right to do what [he] did and [he] is very ashamed and embarrassed."[1] *Defense Exhibit A* – Letter from Mr. Washington at 1. Mr. Washington very much regrets what he did and feels terrible for the "tremendous amount of pain and trouble that [he has] caused [Victim-1]." He now understands that "identity theft is not a victimless crime and that it can wreak havoc on a person's life and it takes a lot of time and perseverance to fix the problem." *Id.*

---

[1] Mr. Washington references Victim-1 by name in his letter. Mr. Washington learned Victim-1's name prior to my appointment as his CJA Attorney or review of any discovery.

4

at 2. Going through his own federal criminal case, Mr. Washington now much better understands the importance of the work that defense attorneys assigned through the Criminal Justice Act do for their indigent clients. With this newfound understanding, Mr. Washington has come to greatly respect CJA attorneys and "all the hard work, expertise, and vast amount of knowledge in dealing with matters such as the one [he] got [himself] involved with" and has "great appreciation for how hard CJA attorneys have to work." *Id.* at 3.

### A. Guidelines Calculations

Pursuant to a written plea agreement dated August 6, 2024, the parties stipulated to the following Guidelines calculations:

Base offense level is **7** because the Defendant (U.S.S.G. § 2B1.1(a)(1))

+   **8 level increase** because the loss was more than $95,000 (U.S.S.G. § 2B1.1(b)(1)(E))

+   **2 level increase** because the offense involved the use of an unauthorized access device (U.S.S.G. § 2B1.1(b)(11))

−   **2 level decrease** because Mr. Washington has clearly demonstrated acceptance of responsibility (USSG §3E1.1(a))

−   **1 level decrease** because Mr. Washington gave timely notice to of his intention to plead guilty, thereby permitting the Government to avoid preparing for trial and the Court to allocate its resources efficiently (USSG §3E1.1(a))

**Total Offense Level: 14**. Pursuant to the sentencing table in USSG Ch. 5 Pt. A, based on a Total Offense Level of 14 and a Criminal History Category of I, the Guidelines range is 15 to 21 months imprisonment. *Plea Agreement* at 2-3.

### V. THE HISTORY AND CHARACTERISTICS OF MR. WASHINGTON

The significance of the first § 3553 factor is based on its comprehension that a consideration of a defendant's criminal conduct cannot disregard the life he has led beyond his crime. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.) ("But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance"). In support of his history and characteristics under 18 U.S.C. § 3553(a)(1), Mr. Washington submits a letter to the Court on his own behalf (*Defense Exhibit A*), in addition to letters from family and friends (*Defense Exhibit B*). Specifically, Mr. Washington submits letters of support from his mother Kareen Washington, his girlfriend Lynell Square, his MDC cellmate David Motovich, and his attorney on the Bronx County matter, Aurora Maoz, Esq.

The letter from Mr. Motovich, age ■, describes how Mr. Washington showed him kindness and helped him cope with every aspect of incarceration as an older, first-time criminal defendant. Mr. Motovich, an Orthodox Jew whose religious beliefs require that he pray three times per day, follow a kosher diet, and observe the Sabbath, describes being moved by Mr. Washington's support in fulfilling his religious observances. Mr. Motovich remarks that he "did not expect to find someone being held in the facility who genuinely thinks of others and looks out for their needs." *See Defense Exhibit B* - Letter from David Motovich. Ms. Maoz expresses similar sentiments, describing Mr. Washington as "one of the most respectful clients I have served during my career as a public defender for the past ten years." *Defense Exhibit B* – Letter from Aurora Maoz, Esq.

6

A. <u>Tragedies During Mr. Washington's Childhood</u>

By any standard, Mr. Washington had an unfathomably difficult upbringing. His mother, Kareen Williams had Mr. Washington at the age of 17 and made the difficult decision to leave Mr. Washington with her mother when he was only a few weeks old, so she could focus on her schooling. *Defense Exhibit B –* Letter from Kareen Washington. His father, Jamel Thompson, was incarcerated for a large part of Mr. Washington's childhood on several state matters and two separate federal cases, which both involved robbery and the use of a firearm during a crime of violence. PSR ¶ 41.

Since age 5, Mr. Washington was raised by his grandmother, Sharon Washington. Ms. Washington was awarded custody of Mr. Washington and his siblings after the children's school reported to the Administration for Children's Services (ACS) that faculty had observed welt marks on the children's backs while they were in the custody of their father. PSR ¶ 48-49. Consequently, Mr. Washington and his siblings were placed in foster care with another family for 30 days while Ms. Washington got clearance for the children to be placed with her. *Defense Exhibit B –* Letter from Kareen Washington.

On March 16, 2003, when Mr. Washington was just 7 years old, his two year old baby brother, J___ R___, was killed by his babysitter,[2] while his mother and stepfather were out of their home. PSR ¶ 42. The babysitter beat and stabbed J___ because he had an ear infection and would not stop crying. PSR ¶ 42. J___'s death led to Mr. Washington acting out in school and lashing out. *Defense Exhibit B –* Letter from Kareen Washington.

When Mr. Washington was 15 years old, he lost his cousin to gun violence, and took that loss very hard. *Id*. Then, when Mr. Washington was 16 years old, his younger brother, M___,

---

[2] See https://www.nydailynews.com/2007/06/12/17-years-for-killer-sitter/

7

was shot and killed at the age of 15 in the lobby of their apartment building.[3] PSR ¶ 46. News reports indicate that M⬛ was shot multiple times in the chest and once in the head.[4] The shooter was never apprehended or prosecuted for M⬛' death. PSR ¶ 46. Mr. Washington believed that he contributed to M⬛ death because "they got into a little argument and [Mr. Washington] told Marquise to go outside and when he did, he got shot 11 times." *Defense Exhibit B* – Letter from Kareen Washington.

The trauma sustained as the result of M⬛ and J⬛ tragic and untimely deaths greatly impacted Mr. Washington. He dropped out of Winthrop High School in Brooklyn during the 11th grade because "other students and faculty were continuously asking him about his brother's death, which became too much pressure for [Mr. Washington] to handle." PSR ¶ 58.

### B. Hardships of Incarceration on Mr. Washington's Family

Mr. Washington's incarceration has posed a significant hardship on his family. Mr. Washington has a 4-year-old son, M⬛ W⬛ with Ameena Darden. He is also involved as a father figure to Mr. Darden's child from a prior relationship. He has assumed a similar role with his girlfriend Lynell Square's children from a prior relationship, aged 7 and 10, as their biological father is not in their lives. PSR ¶ 50. As Mr. Washington states in his letter, raising a child with two parents is hard, but raising a child with one parent is even harder. *Defense Exhibit A* - Letter from Mr. Washington. Mr. Washington states that "it has been extremely difficult for Ms. Darden to care for the children on her own" without Mr. Washington's assistance. PSR ¶ 47.

---

[3] https://www.nydailynews.com/2011/12/24/15-year-old-gunned-down-in-lobby-of-brooklyn-housing-project-shot-8-times-in-chest/
[4] https://www.dailymail.co.uk/news/article-2078405/Teen-gunned-apartment-building-Christmas-Eve--just-feet-cousin-killed-Thanksgiving-year.html

Ms. Square's letter details how helpful Mr. Washington is with her children and household chores: "[h]e loves my kids just as if they were his own. He helps them with homework, takes them to school, picks them up from school, and takes them out. He's has definitely been a big help for me." *Defense Exhibit B* - Letter from Lynell Square. Mr. Washington's mother, Kareen Washington also explains that Markel helps her out with his little sister by picking her up from school and helping run errands for Ms. Washington when she was unable to do so. *Defense Exhibit B* – Letter from Kareen Washington.

C. <u>Conditions at MDC</u>

Mr. Washington's entire term of pretrial detention, which started on February 7, 2024, has been spent at the Metropolitan Detention Center, Brooklyn (hereinafter "MDC"). PSR ¶ 51. While at MDC, Mr. Washington has been incarcerated in Unit 61, colloquially referred to as "Gangland." Mr. Washington is one of only several non-gang affiliated inmates in the unit. As the Court is well aware, MDC is plagued with a plethora of issues, including but not limited to: constant lockdowns, lack of medical and mental health services, inmate-on-inmate and inmate-on-guard violence, and stale, inedible if not outright rotten food. As the Honorable U.S. District Court Judge Gary Brown stated *United States v. Colucci*, "sentencing arguments based on the reportedly deplorable conditions at MDC have become so commonplace that—quite understandably—counsel routinely raise the issue in a shorthand fashion, as lawyers and judges have grown weary of extended articulation." *United States v. Colucci*, No. 23-CR-417 (GRB) (E.D.N.Y. Aug. 5, 2024).

In a published Opinion and Order dated January 4, 2024, the Hon. District Court Judge Jesse M. Furman of the Southern District of New York recounted the dreadful history of the

9

federal facility, identifying three primary issues of concern: (1) "inmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise," (2) "the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates," and (3) "the MDC's physical conditions have long been problematic." *United States v. Chavez*, No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), ECF No. 31. Some inmates have experienced lockdowns for over 50% of their time spent at MDC, an extremely troubling development considering "confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane," *Id*. at 10. According to Judge Furman, "[i]t has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." *Id*. at 2-3.

As recently as September 30, 2024, the U.S. Attorney's Office announced charges against nine individuals in five separate cases addressing violence at MDC Brooklyn.[5] Specifically, four MDC inmates were charged with murder of another inmate, another inmate was charged with attempted murder in a federal detention facility and possession of contraband in prison, and two other inmates were charged with assault in a federal detention facility, another inmate was charged with assaulting a federal officer.

In *Defense Exhibit C*, Mr. Washington provides the following modified operations orders to corroborate the extremely restrictive conditions that he has been subjected to at MDC:

> 1. March 21, 2024 - modified operations, a full lockdown, suspension of social visits due to assault on staff;

---

[5] https://www.justice.gov/usao-edny/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan

10

2. June 7, 2024 - modified operations and a full lockdown as a result of inmate's death;

3. [date unknown] - modified operations and a full lockdown for Unit 61 until July 17, 2024 due to multiple inmate disturbances;

4. July 17, 2024 - modified operations, suspension of social visits and a full lockdown as a result of another inmate's death;

5. October 28, 2024 - modified operations due to an inter-agency operation suspending use of telephones, computers, and social visits and limiting the use of showers; and

6. October 29, 2024 - water outage on the west side of the facility.

Mr. Washington's experience at MDC has been no exception to the innumerable horror stories emerging from the facility. In his letter to the Court, he details inhumane conditions, including: lockdowns, violence, and limited access to showers and running water. In determining Mr. Washington's sentence, the Defense respectfully requests that Your Honor take into account the conditions of Mr. Washington's pretrial confinement.

VI. **THE STATUTORY GOALS OF SENTENCING ARE SATISFIED WITH A SENTENCE OF 1 YEAR AND 1 DAY AND TWO YEARS OF POST-RELEASE SUPERVISION**

Under 18 U.S.C. § 3553(a)(2), the sentencing court is required to consider the need of the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Another factor that must be considered in determining the appropriate sentence is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). The Defense respectfully submits that in Mr. Washington' case, the goals of

11

sentencing are accomplished by a sentence of 1 year and 1 day and two years of post-release supervision.

### VII.  CONCLUSION

For all the foregoing reasons, Mr. Washington respectfully requests that this Court exercise its reasoned judgment and impose a sentence that is sufficient, but not greater than necessary to comply with the statutory objectives of sentencing, which the Defense submits is a sentence of a year and a day followed by two years of supervised release.

Dated: November 19, 2024
       New York, New York

Respectfully submitted,

s/ Elena Fast
Elena Fast, Esq.
*Counsel for Markel Washington*
The Fast Law Firm, P.C.
521 Fifth Avenue, 17 floor
New York, NY 10175
Phone: (212) 729-9494
Email: elena@fastlawpc.com